Frederick JACKSON,
Petitioner-Appellant,

v.

Norman CARLSON,
Respondent-Appellee.

Donald E. DURNS, Petitioner-Appellant,

v.

Harold G. MILLER,
Respondent-Appellee.

Lawrence D. CALDWELL,
Petitioner-Appellant,

v.

J.D. HENDERSON, et al.,
Respondents-Appellees.

Ronald PERRIN, Petitioner-Appellant,

v.

Harold G. MILLER, et al.,
Respondents-Appellees.

James D. YEAGER, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 81–1980, 81–2493, 81–2549,
81–3034 and 82–3014.

United States Court of Appeals,
Seventh Circuit.

Submitted April 11, 1983.

Decided May 12, 1983.

James D. Yeager, pro se, Frederick Jackson, pro se, Stephen P. Sinnott, Chicago, Ill., Ronald Perrin, pro se, Lawrence Daniel Caldwell, pro se, Donald E. Durns, pro se, for petitioners-appellants.

Richard H. Lloyd, Asst. U.S. Atty., (James R. Burgess, U.S. Atty.), Frederick J. Hess, Asst. U.S. Atty., East St. Louis, Ill., for respondents-appellees.

Before WOOD, ESCHBACH, and POSNER, Circuit Judges.

POSNER, Circuit Judge.

We have consolidated these five appeals because they raise common issues regarding federal prison disciplinary proceedings. We dealt with some of these issues recently in *McCollum v. Miller,* 695 F.2d 1044 (7th Cir. 1982); the Supreme Court dealt with others, still more recently, in *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

■ Each of these five cases is a habeas corpus proceeding in which the petitioner alleges that he was deprived of his liberty without due process of law, in violation of the Fifth Amendment, as the result of a federal prison disciplinary sanction. The orderly analysis of such a case requires that three questions be considered in sequence: (1) Can the proceeding be maintained as a habeas corpus proceeding? (2) If so, was there a deprivation of liberty? (3) If so, was there a denial of due process?

■ Although a habeas corpus proceeding challenges the legality of the petitioner's custody, 28 U.S.C. § 2241(c)(3), the challenge can be mounted even if the petitioner is not seeking immediate release from custody, provided he can show that but for the alleged denial of due process he would be released at an earlier date than is now scheduled. *Preiser v. Rodriguez,* 411 U.S. 475, 487–88, 93 S.Ct. 1827, 1835, 36 L.Ed.2d 439 (1973). Where, therefore, as in four of the five cases before us, the disciplinary sanction includes a denial of good-time credits to which the petitioner was entitled as a matter of statute, so that he is indeed seeking release at an earlier date, the suit can be maintained as a habeas corpus suit.

■ However, the petitioner in No. 81–2549, Caldwell, is not complaining of any loss of good-time credits, but simply of having been placed in the Control Unit of the prison—a kind of halfway house to solitary confinement, see *Bono v. Saxbe,* 620 F.2d 609, 613 (7th Cir.1980); 28 C.F.R. § 541.40. We held in *McCollum v. Miller, supra,* 695 F.2d at 1046, that habeas corpus is the proper remedy for getting from a more to a less restrictive custody—specifically, from custody in the Control Unit to normal confinement. Caldwell has since been released from the Control Unit and has rejoined the general prison population. But concerned that the record of his disciplinary infraction might delay his parole—as well it might, see 28 C.F.R. § 2.36(a)—he seeks to have that record expunged. Because he brought his habeas corpus suit while confined in the Control Unit, the possibility that he might suffer some collateral consequence such as delayed parole is enough to preserve the district court's jurisdiction of the suit. *McCollum v. Miller, supra,* 695 F.2d 1047–48, and cases cited there.

■ So we may proceed to the next question, which is whether each of the five petitioners has shown a deprivation of liberty. Retention in custody and deprivation of liberty are distinct legal concepts. Custody is a jurisdictional requirement for bringing a prisoner's suit as a habeas corpus suit under 28 U.S.C. §§ 2241 *et seq.* rather than as a civil rights suit under 42 U.S.C. § 1983. Once the proper procedural route is determined the issue is whether the prisoner's federal rights have been violated. Where the right asserted is the right under the Fifth Amendment not to be deprived of one's liberty without due process of law, the prisoner must show that the disciplinary sanction that he contends denied him due process deprived him of liberty. In the case of the four petitioners who lost good-time credits as a result of the disciplinary proceedings that they are challenging, it may seem obvious that they are complaining of a denial of liberty—the liberty they would enjoy if released earlier, as they would be but for those proceedings. Nevertheless, the Supreme Court noted in *Hewitt v. Helms, supra,* 103 S.Ct. at 870, that it had held that neither parole nor good-time credits "involved an interest independently protected by the Due Process Clause." But the Court went on to make clear, reaffirming *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that if the government creates a right to good-time credits—that is, a firm expectation that if the prisoner complies with specified conditions he will automatically earn the credits and be released earlier—a deprivation of that right is a deprivation of liberty. See 103 S.Ct. at 871.

■ So we must consider whether the statute that gives federal prisoners good-time credits, 18 U.S.C. § 4161, creates such a right. The statute provides, "Each prisoner convicted of an offense against the United States and confined in a penal or correctional institution for a definite term

other than for life, whose record of conduct shows that he has faithfully observed all the rules and has not been subjected to punishment, shall be entitled to a deduction from the term of his sentence," and then provides for so many days to be deducted per month of sentence, depending on the sentence's length. The statute gives the prison authorities no discretion: if the prisoner complies with the requirement of good behavior he "shall be entitled" to time off at a stated rate. This is the language of rights rather than of privileges, and if the government violates this right it deprives the prisoner of his liberty within the meaning of the Constitution. Cf. *Solomon v. Elsea,* 676 F.2d 282 (7th Cir.1982).

But in No. 81–2459 (*Caldwell*) the petitioner is not complaining of the deprivation of his section 4161 rights. He is complaining about being put in a more restricted form of confinement. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (reaffirmed just the other day in *Olim v. Wakinekona,* —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)), which held that a disciplinary transfer from a less to a more restrictive prison does not deprive the prisoner of liberty within the meaning of the due process clause, might be thought to put Caldwell out of court—for what difference does it make whether a prisoner is transferred to a more restrictive prison or to a more restrictive part of the same prison? But *Hewitt v. Helms* prevents us from so ·concluding. The Court held there that the State of Pennsylvania had created an interest in liberty within the meaning of the due process clause by giving a prisoner a right to keep out of disciplinary segregation unless he violated specific conditions. 103 S.Ct. at 871. If the federal prison regulations governing transfer to the Control Unit (see 28 C.F.R. §§ 541.40 *et seq.*) create a similar entitlement, then such a transfer is a deprivation of liberty.

But we do not have to decide whether they do, because there was no denial of due process in Caldwell's case. Although our opinion in *McCollum v. Miller* found the disciplinary procedures at the federal maximum-security prison in Marion, Illinois, where Caldwell is imprisoned, unconstitutional in specific respects, no blanket condemnation of those procedures was suggested. We were dealing · with a situation where the only evidence against the prisoner was an investigator's unsworn report of interviews with prison informants, the investigator did not testify, neither the report nor any of the informants' names were given the prisoner, and in order to protect the informants' anonymity the prisoner was not even told the date or place of the alleged offenses. As we thought there were good reasons for the prison's not giving the prisoner the report itself, the names of the informants, or sufficient specifics of the charge to enable the prisoner to infer their names, it was in our view all the more important that the report be sworn and that the investigator testify before the Institution Discipline Committee. We were unsure whether additional procedural safeguards would be feasible in the menacing conditions at Marion and remanded the case to Chief Judge Foreman for initial consideration of that question. See 695 F.2d at 1049.

Caldwell was not the target of anonymous informants. Prison guards found him at the wall one evening, trying to escape. He did not deny that he was trying to escape, but argued that he had been forced to escape. He was allowed to present this defense and witnesses at his hearing before the Institution Discipline Committee. Two of the other cases before us are quite similar. In No. 81–2493, the petitioner, Durns, was punished for encouraging other inmates to refuse to work at their prison jobs, in violation of prison rules. In finding him guilty the Institution Discipline Committee relied on the eyewitness testimony of a prison employee. Durns was allowed to and did present evidence in his own behalf. In No. 81–3034, the petitioner, Perrin, was punished for possession of a knife that had been found hidden behind the toilet in his cell by a prison guard who was the principal witness against him. Perrin did not deny that the knife was in his cell. His defense was that someone else had put it there. He

was allowed to call witnesses in an effort to establish the defense.

In none of these three cases were the concerns behind our opinion in *McCollum v. Miller* present. Because the prison was relying on the testimony of its own officers rather than on prison informants, the Institution Discipline Committee was able to and did give the accused prisoners specific notice of the charges and an opportunity to confront the witnesses against them. Unlike McCollum, these prisoners had the essential elements of an adversary hearing in the Anglo-American tradition.

But in No. 81–1980 the petitioner, Jackson, was found guilty of an assault in part on the basis of information supplied by informants to an investigator, and as in *McCollum* the investigator's report was not sworn, the investigator did not testify, and neither the report nor the informants' names were supplied to the prisoner. However, he was given detailed notice of the charge—the date, the hour, and the prison gallery where the assault allegedly occurred. Although he was not given the victim's name, the summary of his testimony at the hearing before the Institution Discipline Committee indicates that he knew it (Jackson "said he doesn't know this man Staudemier [the victim] and Staudemier told him when he saw him on the yard that he was not the one that assaulted him"). Moreover, while Jackson testified that he was working in the prison kitchen at the time of the assault, he was unable to produce any witness to support his testimony. Also, the investigative report contained information not only from informants but from a prison employee who had seen Jackson remove a brown stocking cap while leaving the scene of the assault. Thus Jackson had precise notice of the charges against him and a reasonable opportunity to defend himself, and the Institution Discipline Committee had direct evidence from a staff source, albeit presented in the form of hearsay. The proceeding was more informal than it might have been, given the severity of the principal sanction (412 days of good-time credit forfeited), but

the informality did not create so great a risk of a miscarriage of justice as to violate Jackson's constitutional rights.

The last case, No. 82–3014 (*Yeager*), though factually similar to *McCollum v. Miller* in involving extortion of commissary money and of homosexual acts, has distinguishing features which make it, in contemplation of law, more like *Jackson*. Yeager received fairly complete notice of the three alleged incidents of extortion. The notice included the date (though not time) of the incident, where in the prison it took place, and the precise nature of the threat. The information should have been sufficient to enable Yeager to identify each of the informants. Furthermore, the chairman of the Institution Discipline Committee stated on the record that he had firsthand knowledge of the sources of information and considered them reliable on the basis of "their past record of reliability." This warrant of reliability was conspicuously lacking in *McCollum*. See 695 F.2d at 1049. In these circumstances, we do not think the Constitution required the investigator to testify or swear to the truth of his report summarizing the informants' statements.

In sum, in all five cases the particular combination of circumstances that persuaded us in *McCollum v. Miller* that there had been a denial of due process in a prison disciplinary proceeding is absent. Informal as the proceedings in these five cases were—deficient as they were in some of the accepted attributes of adversary hearings in our legal system—still they were not so lacking in procedural safeguards that they create substantial doubt that these prisoners committed the offenses for which they were disciplined.

From what we have said it should be clear that we also reject the petitioners' subsidiary contentions that their disciplinary sanctions were unsupported by substantial evidence, that they were denied the right to call witnesses or confront their accusers, and that adequate staff representation was not supplied (as argued in No.

81–3034). No court has recognized any sort of right to counsel in prison discipline cases; the right to call and confront witnesses is strictly limited in the prison setting, *Baxter v. Palmigiano,* 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976); *McCollum v. Miller, supra,* 695 F.2d at 1049, and was not violated here; and unless we are persuaded that no reasonable adjudicator could have found the prisoner guilty of the offense charged on the basis of the evidence presented—and we are not so convinced in any of these cases—we cannot conclude that there was a denial of due process, see *Aikens v. Lash,* 514 F.2d 55, 60–61 (7th Cir.1975), vacated and remanded on other grounds, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191, modified and reinstated, 547 F.2d 372 (7th Cir.1976); *Chavis v. Rowe,* 643 F.2d 1281, 1287 (7th Cir.1981); *Smith v. Rabalais,* 659 F.2d 539, 545 (5th Cir.1981); *Willis v. Ciccone,* 506 F.2d 1011, 1018, 1019 n. 11 (8th Cir.1974).

One point remains to be considered. In No. 82–3014 (*Yeager*), the government has argued that we cannot reach the merits because the petitioner failed to exhaust his remedies within the prison system. The argument is difficult to evaluate on the papers before us, so if the exhaustion requirement is jurisdictional we would have to remand the case for a further hearing on the exhaustion issue. Unlike the case of state prisoners seeking federal habeas corpus, see 28 U.S.C. § 2254(b), there is no statutory requirement that federal prisoners seeking habeas corpus exhaust any administrative or other remedies they may have. Since we have held that the statutory exhaustion requirement for state prisoners is not jurisdictional, *Echevarria v. Bell,* 579 F.2d 1022, 1025 (7th Cir.1978), it seems clear that exhaustion is not a jurisdictional prerequisite in federal prisoner cases. That is not to deny the obvious good sense in imposing an exhaustion requirement in such cases, and we take this opportunity to make clear that exhaustion is required in them, with the usual exceptions. See *Guida v. Nelson,* 603 F.2d 261, 262 (2d Cir.1979) (per curiam), and cases cited there. But it is not a jurisdic-

tional requirement; and since we therefore have the power to reach the merits, and are convinced that Yeager's claim is without merit, no purpose would be served by remanding for a hearing on the question of exhaustion.

The judgments denying the petitions for habeas corpus are

AFFIRMED.