**SHANGO (Cleve Heidelberg, Jr.), Plaintiff,**

v.

**Mary JURICH, et al., Defendants.**

**Nos. 74 C 3598, 76 C 3068, 76 C 3379 and 77 C 103.**

United States District Court, N.D. Illinois, E.D.

April 10, 1985.

George J. Casson, Jr., Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

Michael T. Mullen, Alison Breslauer, Asst. Attys. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Cleve Heidelberg, Jr. ("Shango," the name by which he is known in the prison community) filed suit under 42 U.S.C. § 1983 ("Section 1983") against various officials of the Illinois correctional system, seeking injunctive relief and damages stemming from (1) the prosecution of disciplinary charges against Shango and (2) his transfer from Stateville Correctional Center ("Stateville") to Menard Correctional Center ("Menard").[1] Shango and defendants have filed cross-motions for summary judgment under Fed.R.Civ.P. ("Rule") 56 on Counts IV and VII of the supplemental

complaint. Each count asserts due process deprivations: Count IV in connection with Shango's placement on investigative status and his consequent discipline on charges of deviate sexual assault on another Stateville resident, and Count VII in connection with Shango's placement on investigative status on false charges of assault on a Menard resident. For the reasons stated in this memorandum opinion and order, each party's motion is granted in part and denied in part.

### Facts [2]

#### Count IV

On July 14, 1980 Stateville resident Stephen Edwards ("Edwards") complained to Stateville Internal Affairs Officer Ulsey Price ("U. Price") that Edwards had been the victim of extortion and "sexual assault and trafficking" at the hands of Shango and other Stateville residents. U. Price arranged for Edwards to take a polygraph examination. When the results indicated Edwards had been telling the truth, U. Price issued Resident Disciplinary Reports (RDRs) to Shango and the other residents Edwards had named, placing them all on investigative status.[3] Accordingly Shango was transferred to segregation pending the outcome of U. Price's investigation.

As required by Administrative Regulation ("A.R.") 804(II)(J), the July 14 RDR issued to Shango came before the Adjustment Committee ("AC") for review July 16. According to the AC summary of proceedings, Shango denied the charges under investigation and objected to having been

1. Shango's claims have already been the subject of substantial judicial effort. For further background on the procedural context for the present motion, see the earlier opinions at 521 F.Supp. 1196 (N.D.Ill.1981) and 681 F.2d 1091 (7th Cir.1982).

2. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all inferences in the light most favorable to the nonmovant. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Cross-motions for summary

judgment thus call for a dual perspective in any controverted factual areas. As this opinion makes plain, that potentially troublesome treatment (which can sometimes force the denial of *both* motions) poses no difficulties here.

3. One space on the RDR form calls for the date and time when the officer observed the conduct giving rise to the investigation. In that space U. Price incorrectly wrote "Approx. 4:00 p.m., 7/14/80" (the time U. Price became aware of the alleged assault and concluded further investigation was appropriate, rather than the time the offending conduct itself—the alleged sexual assault—occurred).

placed on investigative status. Neither U. Price nor any other witnesses appeared before the AC. Nonetheless the AC decided Shango should be placed on investigative status on the basis of the July 14 RDR. Under the heading "BASIS FOR DECISION/EVIDENCE RELIED UPON," the AC stated only: "As per Int. Affairs Lt. Price."

On July 14 U. Price also prepared a preliminary investigative report outlining Edwards' accusations, the results of Edwards' polygraph examination and the results of an examination of prisoner trust fund records consistent with Edwards' charges of extortion. Thereafter U. Price interviewed various residents as to Edwards' allegations, but he discovered nothing—beyond Edwards' statement and the confirming polygraph results—bearing on the allegations of sexual assault against Shango. On July 23 and 24 U. Price and Special Investigator Al Faro ("Faro," who had become involved in the investigation after U. Price's July 14 request for an emergency polygraph examination of Edwards [4]) met with Shango to discuss the investigation. Shango denied involvement in any sexual assault on Edwards and demanded to see the results of Edwards' polygraph examination. His demand was denied on confidentiality grounds, and no other information about the alleged assault was provided to Shango. Shango refused to take a polygraph examination himself until he had been given more specific information about the circumstances of the alleged assault.

On July 25 U. Price issued a second RDR charging Shango in these terms:

Based on the results of an investigation conducted by the office of Internal Affairs, and the official results of a polygraph examination, Resident Cleve Heidelberg # C01521 is being charged, with

being in Violation of A.R. 804 Rules No. 24, and 28.

On July 24, 1980 [5] a copy of a polygraph examination taken by resident Stephen Edwards indicated, he was telling the truth, when he stated that during the month of June 1980 on at least one occasion you paid another resident to force Edwards to have an unnatural sex act with you. This action was clearly in violation of Rule 24. Engaging with others in or pressuring others to engage in any unnatural sexual activity, and Rule No. 28 violating the general laws of the State or Federal Government to wit: Criminal Law and Procedure 38–11–3. Deviate Sexual Assault. Any person of the age of 14 years and upwards who by force or threat of force, compels any other person to perform or submit to any act of deviate sexual conduct commits Deviate Sexual Assault. (Definition 11–2 Deviate Sexual Conduct) "Deviate sexual conduct" for the purpose of this article means any act of Sexual gratification involving the sex organs of one person and the mouth or anus of another. You were given an opportunity to take a pol[y]graph examination on these charges. You Heidelberg C01521 decline therefore you are so charged.

Shango was served with the RDR at approximately 12:15 p.m. July 25. He waived his right to 24 hours' notice and came before the AC the morning of July 26.

Though he had the right to do so, Shango called no witnesses before the AC, arguing he had not been informed of the date or time of the alleged assault and so was not in a position to present a defense. Nor did U. Price testify before the AC. Two members of the AC have said Shango was read certain portions of Edwards' polygraph examination results and the preliminary investigation report, but they do not recall which portions were read to him, nor does

---

4. Faro ultimately prepared his final report September 9, reflecting the results of interviews with a number of residents named by Edwards as involved in illegal activities. Several of those residents admitted they had had sexual relations with Edwards as he had charged. Nothing in

the September 9 report bears directly on the charges of sexual assault against Shango.

5. [This Court's note]: In fact Edwards was given the polygraph examination July 14, not July 24.

the AC decision (quoted below) refer to that fact at all. In any case Shango was not told the time, date and place of the alleged assault—information the prison authorities themselves had been unable to discover in the course of their investigation. Like Shango, they had only Edwards' assertion—supported by the polygraph test—that the incident had occurred sometime in June. They did however have one important item of relevant information that was not provided Shango: Edwards' identification of Dwight Griffin as the resident whom Shango allegedly paid and who in turn forced Edwards to engage in sexual relations with Shango. Knowing essentially no more than was stated in the July 25 RDR, Shango again refused to take a polygraph test to confirm his denial of the alleged sexual assault.

Not surprisingly, the AC found Shango guilty of the charge and recommended his demotion to C grade, confinement to segregation for one year and deprivation of one year of statutory good time. Its summary described the AC's reasons as follows:

> Interview with resident. Adjustment Committee is relying on accuracy of polygraph examination and Internal Affairs investigation.

Stateville Warden Richard DeRobertis ("DeRobertis") approved the AC decision.

Shango then appealed the decision, first to the Institutional Inquiry Board ("IIB") and then to the Administrative Review Board ("ARB"). Both bodies affirmed the AC decision, rejecting as insubstantial Shango's claim that he had been denied due process. Accordingly Shango remained in segregation (both at Stateville and later at Menard) from July 14, 1980 to July 13, 1981, when this Court entered a preliminary injunction ordering defendants to remove Shango from segregation, to restore to him the one year of good time that had been forfeited and to credit him with the good time he had lost while in C grade. Shango now seeks to make that injunction permanent and to recover compensatory and punitive damages for the time he spent in segregation.

*Count VII*

On October 24, 1981 investigator William Price ("W. Price") issued an RDR requesting that Shango be placed on investigative status pending investigation of an assault that day on Menard resident Tyrone Joseph ("Joseph"). Shango was immediately placed in investigative segregation. On October 27 the October 24 RDR came before the AC, which confirmed Shango's placement on investigative status:

> Report read and Inmate advised he is being placed on investigative status as of this date per Investigator William Price for an assault upon Inmate Tyrone Joseph A 92470 committed 10/24/81. Inmate states he had nothing to do with this & resents being placed on Investigation.

On the same day W. Price discovered Shango had been mistakenly identified as the person who assaulted Joseph and immediately reported the mistake to his superiors. In the meantime the AC summary had been forwarded to DeRobertis, who (obviously unaware of the mistaken identification) approved the AC decision November 2.

Precisely when Shango was taken off investigative status remains unclear. Shango alleges he remained in investigative segregation until November 3. Defendants' Answer to Shango's Complaint said they lack knowledge or information sufficient to form a belief as to the truth of that averment. But in an answer to an interrogatory put to him by Shango W. Price stated:

> After I learned of this error I informed my supervisor and the Adjustment Committee. The plaintiff was released from investigative segregation on October 28, 1981.

Shango has offered no direct evidence to rebut that statement, but he does assert that defendants' conduct in connection with the October 24 RDR and the AC review violated his right to due process. He seeks compensatory and punitive damages for each day he spent in investigative segregation.

*. Placement on Investigative Status*

 Shango contends the July 14 and October 24 RDRs and the attendant AC hearings were constitutionally deficient in several similar respects: [6]

1. U. Price's July 14 RDR failed to provide adequate notice of the underlying charges because it did not indicate the date, time and place of the alleged incident, the identities of any other persons involved or any other facts known to U. Price.

2. In the absence of adequate notice, Shango was unable to present witnesses or other evidence in his defense at the July 16 hearing. Moreover, the AC itself reviewed no evidence but rather placed Shango in investigative segregation solely on the basis of the July 14 RDR.

3. W. Price's October 24 RDR failed to provide adequate notice of the underlying charges because it did not provide a description of the incident, specify where the incident took place or indicate whether or not there had been witnesses.

4. As was true of the 1980 proceedings, at the October 27, 1981 AC hearing the AC members merely read the October 24 RDR and placed Shango in investigative segregation, providing no adequate written statement of the evidence relied upon or of the reasons for the action.

In short Shango contends he was denied due process because he was placed on investigative status without the full range of procedures required by *Wolff v. McDonnell*, 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974) for prison disciplinary actions involving the loss of statutory good time.

But *Hewitt*, 459 U.S. at 475, 103 S.Ct. at 873, teaches "elaborate procedural safeguards" are not required where a prisoner is confined to "administrative segregation pending completion of the investigation of the disciplinary charges against him." [7] Instead *Hewitt* characterized the process to be afforded such a prisoner as the equivalent of a probable cause hearing even more limited procedurally than that mandated by *Gerstein v. Pugh*, 420 U.S. 103, 119–23, 95 S.Ct. 854, 865–68, 43 L.Ed.2d 54 (1975). *Hewitt* then went on to say (459 U.S. at 476, 103 S.Ct. at 874):

---

**6.** In addition to claiming violations of his Fourteenth Amendment due process rights, Shango contends defendants violated ARs. Those regulations of course are not necessarily coextensive with what the Constitution requires, so a violation of an A.R. need not infringe the Fourteenth Amendment as well. Because Shango does not purport to assert a pendent state cause of action based upon defendants' alleged violations of the regulations, this opinion focuses only on what the Constitution requires. Of course the regulations are relevant to the constitutional inquiry if and to the extent they give rise to a "justifiable expectation" on the prisoner's part "that the challenged action will not be taken absent the occurrence of a specified factual predicate." *Stringer v. Rowe*, 616 F.2d 993, 996 (7th Cir. 1980), quoting *Arsberry v. Sielaff*, 586 F.2d 37, 45 (7th Cir.1978). By that means the state creates a liberty interest protected by the Fourteenth Amendment. That view was recently confirmed by the Supreme Court's analysis of Pennsylvania prison regulations in *Hewitt v. Helms*, 459 U.S. 460, 469–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983).

**7.** Shango R.Mem. 4–8 mounts an argument that *Hewitt* is inapplicable here because of the difference in the prison regulations involved. Shango contends A.R. 804(II)(J) creates a liberty

interest identical to the interest attending upon disciplinary segregation. That is simply wrong. True enough, A.R. 804(II)(J)(1) does state:

> As the [investigative] holding unit functions in the same manner as a segregation unit (except that single celling is not required in the holding unit) a resident must be provided with the same procedural safeguards and services as are required by this regulation relative *to* placements, conditions and services in a segregation unit.

But that language, while sufficient to create a liberty interest as to investigative confinement, does not equate such confinement with disciplinary segregation. Indeed A.R. 804(II)(J)(2) goes on to specify that an inmate on investigative status need not be given information if to do so "would be a detriment to the investigation process." Moreover, A.R. 804(II)(J)(3) prohibits holding an inmate in investigative segregation for more than 30 days. It is clear, too, that placement on investigative status does not warrant demotion in grade or forfeiture of statutory good time, as disciplinary segregation often does. Plainly *the two types of segregation are not identical and do not involve equal stigma.* See *Hewitt*, 459 U.S. at 473, 103 S.Ct. at 872.

We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charge and then-available evidence against the prisoner, the Due Process Clause is satisfied. Finally the informal hearing "must occur within a reasonable time following an inmate's transfer, taking into account the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials" (*id.* at 476 n. 8, 103 S.Ct. at 874 n. 8).

This Court is called on to measure, against those *Hewitt* standards, the process Shango was afforded both times he was placed on investigative status. In each instance the process was constitutionally adequate, though the 1980 detention poses a close question.

█ As to the 1980 placement, the July 14 RDR stated only that Shango was being confined pending an investigation "into charges of extortion, sexual assault and trafficking, etc." It did not cite the substantive regulation on which the charges were based—rather it referred only to the regulation authorizing investigative segregation in cases where "the interest of institutional security and safety" (A.R. 804(II)(J)(1)) require it. Nor did the RDR make any reference, however obliquely or abstractly, to the more specific information included in the preliminary investigation report prepared by U. Price on the same date as the RDR. And the AC had no more before it when it placed Shango on investigative status July 16. Without consulting with U. Price and without having seen the preliminary investigation report, the AC allowed Shango to make a statement and then made its decision on the basis of the RDR alone.

Given what U. Price knew July 14, it is plain (1) Shango could have been afforded more thorough notice and (2) the AC could have grounded its conclusion on a stronger evidentiary base. Nevertheless what was done did satisfy the requirements of the Fourteenth Amendment. At issue after all was not the prosecution of charges but only their investigation. Prisoners' due process interests are not very powerfully implicated by decisions to pursue investigations against them. Here the charges were highly serious, involving direct threats to the security of both the institution and its residents. Indeed a different state policy—whether express or in practice—that would *automatically* confine any prisoner under investigation on such charges might well not be open to serious constitutional challenge. In such cases the prisoner's interest in not being moved from "an extremely restricted environment to an even more confined situation" is outweighed by the state's interest in maintaining order and security in its correctional facilities. *Hewitt*, 459 U.S. at 475–76, 103 S.Ct. at 872–73.

Under the circumstances the fact that Shango had notice of the nature of the offense under investigation—though not of its factual basis—at least alerted him as to why he was being confined and provided some basis for him to make a statement before the AC. And in the same circumstances the AC's decision to confine Shango for a limited time on the basis of the RDR alone does not violate the Fourteenth Amendment, at least in the absence of an egregious deficiency in the RDR giving rise to a suspicion that the investigation was initiated in bad faith.

█ In comparison with the 1980 RDR and AC determination, the handling of Shango's 1981 placement in investigative status poses little difficulty. Again the

underlying charge was one that directly implicated institutional safety and security. This time the October 24 RDR provided Shango with specific factual information about the charge, identifying the inmate he was suspected of assaulting as well as the time of the suspected assault. On the basis of those facts, too, the AC was justified in confining Shango to administrative segregation after having given him an opportunity to make a statement.[8]

### Disciplinary Proceedings

■■■ Shango's disciplinary proceedings (the July 25 RDR formally charging him with having paid another resident to force Edwards into sexual relations, and the July 26 AC hearing resulting in disciplinary action) must track the minimal procedural due process requirements set out in *Wolff,* 418 U.S. at 563–67, 94 S.Ct. at 2978–80. In particular *Wolff* requires (1) advance written notice of the alleged violation, (2) an opportunity for the inmate to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals, and (3) a written statement of the factfinders as to the evidence relied on and the reasons for the disciplinary action taken. In addition an inmate must be given the substance of any exculpatory evidence prison officials may have. *Chavis v. Rowe,* 643 F.2d 1281, 1285–86 (7th Cir.1981).

Shango claims the July 25 RDR was deficient in *Wolff* terms because it did not specify the date, time or place of the alleged violation and because it did not identify Griffin. As a consequence, he says he was deprived of an opportunity to call witnesses and present documentary evidence.

In that respect our Court of Appeals' analysis in *McCollum v. Miller,* 695 F.2d 1044, 1048–49 (7th Cir.1983) is startlingly apropos—albeit in the negative sense. *McCollum* too involved a charge of prisoners pressuring other inmates to engage in homosexual acts, with the accused inmates not being afforded full information about the factual allegations against them. In relevant part the court said (*id.*):

> Ramirez-Rodriguez argues that he should have received both a more detailed notice of the charges against him and more safeguards against erroneous findings at the hearing. The notice he received was so general that it was difficult for him to prepare any defense. But unfortunately the costs of additional notice would have been great. The essential information that Ramirez-Rodriguez needed to prepare his defense was the time and place of each alleged act of extortion. Any information falling short of this would have added nothing of value to the uninformative statement of charges which he did receive. But the additional information would have tipped him off to the names of all or most of the informants, whether the informants were the alleged victims of extortion, or witnesses to the alleged acts of extortion, or some of each. Such a tip-off could be lethal. Marion is the successor to Alcatraz as the maximum-security federal penitentiary. Not only does it have the most dangerous federal offenders, but it takes in, by way of assistance to the very overcrowded state prisons of the area, some of the most dangerous state offenders. Violent crime directed at other inmates is a common experience in our prisons today, and "rats" are frequent targets. See, e.g., *United States v. Bruscino,* 687 F.2d 938, 939 (7th Cir. 1982). In the short run revealing the names of informants against a gang of extortionists and homosexual molesters

---

**8.** A.R. 804(II)(J)(4) provides:

> A resident's placement on investigative status in the holding unit is temporary in nature. Such placement is to be terminated immediately if it appears that the investigation will not be successful in proving a violation by the resident....

While there is some question as to how quickly Shango was released following the discovery he had been mistakenly identified as the person who assaulted Joseph, Shango has not focused on the date of his release as an element of his claim. In any event, even if Shango's release date were November 3—following discovery of the mistake on October 27—that delay, though perhaps violative of A.R. 804(II)(J)(4), would *not rise to the level of a constitutional violation* cognizable under Section 1983.

could lead to the death or serious injury of some or all of the informants; in the long run it would dry up the supply of informants and allow extortion to rage unchecked through Marion.

These costs outweigh in our judgment the benefits, substantial as they would be, of giving inmates accused of serious offenses the information they need to prepare an effective defense. But without such notice the adversary hearing so prized in American procedure is likely to have little meaning. The inmates will not know what the evidence is against them, so they will not be able to counter it with evidence of their own. The disciplinary proceeding will be inquisitorial. The conditions in Marion today make that inescapable and it is therefore consistent with due process. But if the usual safeguards of an adversary procedure are unavailable it is all the more important that there be other safeguards, and we find none in this case. Cf. *Helms v. Hewitt*, 655 F.2d 487, 502 (3d Cir.1981). The report of the investigator is persuasive in its detail, but an investigative report, however vivid and apparently true, is not, as the magistrate thought, self-validating. The investigator was not called as a witness, although his identity is not confidential. He was not asked to swear to the truth of the report. None of the informants testified before, or was interviewed by, the Institution Discipline Committee. The Committee would not even vouch for the credibility of the investigator or his informants. All it said was that information received from confidential sources had proved reliable in the past—not necessarily information from these sources, compiled by this investigator. Not all prison inmates who inform on other inmates are telling the truth; some are enacting their own schemes of revenge; and though it is unlikely that all or most of the informants interviewed for the investigative report were lying, if some were that could have affected the severity of the sanction that the Committee meted out to Ramirez-Rodriguez.

Here both the contrasts with and the parallels to *McCollum* are dramatic. By way of contrast, defendants cannot claim the incomplete disclosure to Shango was responsive to the kind of institutional concerns identified in *McCollum* as justifying such treatment. Certainly the potentially most sensitive fact from that point of view was the identity of *Edwards* (the alleged victim), and that was voluntarily disclosed in the RDR. Because Shango was charged with having paid another inmate to force Edwards into sexual relations, thus requiring Shango to prove a negative to refute the charge, the withholding of the other inmate's identity has Kafkaesque overtones (in essence, Shango must be presumed to have guilty knowledge in order to know the particulars of what he has to disprove).[9] Thus the disclosure situation was bizarre indeed: Shango was informed of the potentially most sensitive information but not of the less problematic information important to preparation of his defense.

Though perhaps not quite as clear a case of nondisclosure, defendants also proffer no real justification for withholding Edwards' polygraph from Shango. It is true of course the RDR's omission of the time, the date and the place of the alleged attack could not be helped. U. Price had not been able to uncover that information. But that very fact—the placing of the alleged misconduct at an unknown time during a whole month, and at an unknown place—made it all the more important that what *was* known to the investigator and to the AC be told to Shango. See *Jackson v. Carlson*, 707 F.2d 943, 947 (7th Cir.1983), explaining *McCollum* in that respect. In the institutional setting, with all of its re-

---

**9.** There is no hint the identity of *Griffin* had to be shielded to serve institutional concerns. He was not an informant, but rather a target of the investigation (Edwards' polygraph, part of the record before this Court though not furnished to Shango, also named Griffin as having engaged in homosexual acts with Edwards). And as already stated under "Facts," RDRs had been issued to all the residents Edwards named, so the charges against Griffin were not under wraps.

strictions on (and recordkeeping of) inmate movement, an innocent inmate's ability to prove an alibi to a time-specific charge is much greater than in a free society. It is impossible to say whether, had Shango been told Griffin was his alleged co-conspirator and had Shango been given access to the polygraph information, he might have learned enough to present a material defense.

By way of parallel to *McCollum*, investigator U. Price "was not called as a witness" nor was he "asked to swear to the truth of the report." No other witness (including Edwards) "testified before, or was interviewed by" the AC. All the due process concerns voiced by *McCollum* apply here in full force.

In sum, the July 25 RDR was constitutionally deficient in the first *Wolff* requirement (the advance written notice of violation) and perhaps therefore in the second (because the inadequate notice may well have impaired Shango's ability to call witnesses and otherwise to present his defense). But to complete the story, the third *Wolff* ingredient—the written statement of the AC—was constitutionally flawed as well. All it told Shango was:

> Interview with resident. Adjustment Committee is relying on accuracy of polygraph examination and Internal Affairs investigation.

That does not meet the standard defined in *Wolff*, as applied in such cases as *Chavis*, 643 F.2d at 1287 and *Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir.1984) (per curiam) and as explicated in *McCollum*.

### Relief

Because the July 25 RDR and the July 26 AC hearing violated Shango's due process

rights as set out in *Wolff* and its Seventh Circuit progeny, this opinion must turn to the question of an appropriate remedy. Shango asks this Court to make permanent the preliminary injunction entered July 13, 1981, ordering the expunction of the disciplinary violation from Shango's record and the restoration of both the good time he forfeited and the good time he would have earned during the year spent in segregation. In addition Shango seeks compensatory damages of $100 and punitive damages of $100 for each day spent in segregation.

◼ Any final determination now as to permanent injunctive relief or damages would be premature. Where there is reason to believe disciplinary action would have been taken even if the flawed hearing *had* comported with due process, *Carey v. Piphus*, 435 U.S. 247, 260, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) teaches an award of damages may well "constitute a windfall, rather than compensation." Much the same may be said about injunctive relief of the sort Shango requests.[10] Surely the record here contains evidence indicating Shango may well have been disciplined had his due process rights been fully respected. It must be remembered the information the AC had but did not tender to Shango bore only on the AR 804(II)(A)(1)(24) charge of pressuring another into engaging in unnatural sexual activity, not on the charge of actually committing such activity.[11]

Under the circumstances the proper course is to permit defendants to offer evidence showing there was just cause to discipline Shango and that he would have been disciplined had he been afforded his

---

**10.** *Redding v. Fairman*, 717 F.2d 1105, 1119 (7th Cir.1983) explains prison officials have a stake in the award of injunctive relief:

> The decision to expunge a violation from an administrative record should result from balancing the interests of the parties. The defendants have an interest in maintaining accurate records and insuring prison security. The plaintiffs' interest in avoiding adverse consequences is apparent.

That appears equally true of an order compelling prison officials to restore an inmate's good

time credits. In those terms an unmerited award of injunctive relief can be as much of a windfall as an award of damages.

**11.** It is true the skeletal (and constitutionally deficient) AC statement of the evidence relied on and of the reasons for its disciplinary action related to *both* charges, as did the AC's failure to comport with the due process hearing requirements identified in *McCollum*. However that does not change the analysis in the text.

due process rights. For that purpose any relevant evidence may be offered by either party, whether or not part of the administrative record of the disciplinary proceedings. See *Redding,* 717 F.2d at 1118. In addition defendants may offer argument on the questions (1) whether they have a qualified good faith immunity defense to Shango's prayer for damages and (2) whether punitive damages may be properly awarded against them. At the next status hearing (set for April 16, 1985 at 9 a.m.), this Court and the parties will address the appropriate timetable and procedure to be followed.

### Conclusion

This opinion has reflected there is no genuine issue of material fact as to Shango's allegations in Counts IV and VII of the supplemental complaint. Defendants are entitled to a judgment as a matter of law as to Count VII and as to the portion of Count IV challenging Shango's placement on investigative status, and Shango's action is dismissed with prejudice to that extent. As to the portion of Count IV challenging Shango's disciplinary treatment, Shango is entitled to a judgment as a matter of law as to liability, but a further hearing is required to ascertain the appropriate relief.