**Russell C. BAKER, Plaintiff–Appellant,**

v.

**Howard N. LYLES, Warden; Lawrence Carpenter, Security Chief; Major Thompson, Acting Security Chief; Lt. Elijah Thomas, Defendants–Appellees.**

No. 88–6623.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 15, 1989.

Decided June 7, 1990.

As Amended June 19, 1990.

Rehearing and Rehearing In Banc Denied Aug. 2, 1990.

---

Russell C. Williams (argued), Richmond, Va., for plaintiff-appellant.

Glenn William Bell, Asst. Atty. Gen. (argued), J. Joseph Curran, Jr., Atty. Gen., Gertrude C. Bartel, Kramon & Graham (on brief), Baltimore, Md., for defendants-appellees.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

Russell C. Baker, a Maryland inmate, brought this action under 42 U.S.C. § 1983 against Warden Howard N. Lyles, Security Chief Lawrence Carpenter, Acting Security Chief Major Thompson and Lieutenant Elijah Thomas of the Maryland Penitentiary, claiming violations of his due process rights as a result of the initiation, investigation and prosecution of a prison disciplinary proceeding in which he was convicted of possession of escape contraband and of association with other inmates in an escape attempt. He claims that his conviction was based solely upon the hearsay statement of an unidentified informant, whose reliability was not established at the hearing, and this was a violation of due process.

The district court granted the defendants' motion for summary judgment, and we affirm.

I

On August 31, 1985, Baker, then an inmate at the Maryland Penitentiary, was charged with having escape contraband in his possession. This contraband was believed to be related to a planned escape. The charge was based upon information received by the defendant, Lieutenant Elijah Thomas, from an unidentified inmate informant. On September 3, 1985, a Notice of Infraction was served upon Baker with an attached photograph of the contraband, which was one hacksaw blade and one jeweler's string. In signing for the Notice of Infraction, Baker sought no witnesses, and at the hearing on September 4, 1985, he requested no witnesses. He was represented at the hearing and testified that he was innocent, claiming that another inmate was mad with him and reported him for something he had not done. Baker had a history of escape, escaping from the Baltimore County Jail on April 28, 1982.

Baker's claim of a due process violation results from the hearing officer's reliance upon a statement of an unidentified informant or informants contained in a letter of September 3, 1985, from Lieutenant Thomas to Chief of Security Carpenter. This letter outlined efforts made by Lieutenant Thomas to locate some escape tools that were suspected of being in the penitentiary. The letter stated in part:

Acting on information received, I conducted an investigation in an effort to locate some of the escape tools that was

[sic], and still is [sic], suspected of being in this institution.

During my inquiries, I received information from a *very reliable source* that Inmate Russell Baker #161861 had knowledge of the whereabuts [sic] on some of the tools which had been used. My sources assured me that they could obtain the tools if given the opportunity to be able to talk to the Chief of Security. I did tell the source that I could make certain that they were given the chance to speak with the Chief of Security. (Emphasis Added).

At approximately 2:30 p.m., August 31, 1985, I was given one (1) hacksaw carbine blade and one (1) jewelers string by one of the persons previously mentioned. I asked him where did he get these items from and he stated that he got them from Inmate Russell Baker (see attached statement).[1]

On September 4, 1985, Hearing Officer Tilley found Baker guilty of possession of the escape tools and recommended the loss of 15 days of good time and 210 days punitive segregation. On September 20, 1985, Baker received Notice of Assignment to Administrative Segregation from Security Chief Carpenter giving as reasons: "To prevent escapes, reasons exist to believe that you are an escape risk.... Reasons exist to believe you are dangerous to the security of the institution, and/or inmates, and/or staff." On the same date, Security Chief Carpenter forwarded an Evaluation–Administrative Segregation on Baker and two other prisoners to Classification Supervisor H.E. Rodgers, which stated:

This request for administrative segregation placement pertains to the above captioned inmates, who were found guilty by the institution's Adjustment Team, given extensive segregation sentence for their involvement and/or participation in an escape attempt from this institution. However, on August 29, 1985, I learned that several inmates were planning a mass escape attempt from the institution, by way of an exhaust fan, located in this institution's Chapel, by sawing several grill gate bars. When a search was conducted of the Chapel on August 29, 1985, several bars were found cut; which created a large hole in the grill gate of the Chapel, enabling a person(s) to crawl through to gain access to a [sic] exhaust fan on the wall, leading out into the street.

Afterwards, a further check of the Chapel area was made. The wall exhaust fan, inside of it, had been tampered with, the bolts and fan belt was [sic] removed; indicating that an escape attempt was in fact in progress. During my investigation into this instant matter, the above captioned inmates were either identified as having knowledge of and/or participated in planning the escape attempt. Also, if the plan was successful, they were actually planning to escape.

Each of the above inmates' base files were reviewed and indicated that since their incarceration in the Division of Correction, they have incurred a number of serious infractions, which their base files will disclose.

Based on the above information, I have reasons to believe that the above inmates are escape risks and are a danger to the security of this institution. Therefore, please make immediate arrangements to evaluate them for assignment to administrative segregation; and if approved, assigned to that status at the completion of their present segregation sentences.

On September 26, 1985, a prison Classification Team recommended against placement on administrative segregation, because the hearing commenced 45 minutes past the 96 hours allowed between the time of notification of assignment to administrative segregation and the time of the hearing, as provided in D.C.R. 110–19. The warden disapproved this recommendation because the 45–minute delay was not "a sufficient violation of inmates' due process to sacrifice security." The warden directed

---

**1.** This attached statement cannot be found. The Inmate Grievance Commission on September 4, 1986, ordered all records of Baker's conviction expunged, and it is thought that this statement was lost at that time.

the Classification Team to rehear the matter. The Classification Team reconsidered Baker's classification on October 8, 1985, and by this time the team was aware of Baker's escape history—escape from the Baltimore County Jail on April 28, 1982. The Classification Team postponed final action for 30 days, and Baker was continued on administrative segregation. On October 24 and November 15, 1985, the Classification Team again considered Baker's status and on each occasion postponed action for 30 days. On December 10, 1985, the team recommended placement in administrative segregation, finding that Baker was an "escape risk based on [his] escape history esp 8/31/85 infraction." The warden approved this recommendation and notified Baker, explaining that segregation was "to prevent escapes[;] reasons exist to believe that you are an escape risk."

Baker's classification status was reviewed every month while he continued on administrative segregation. On each review the Classification Team recommended that Baker be kept on administrative segregation as an escape risk. After the initial decision against him, Baker appealed to the Inmate Grievance Commission (IGC). His case was heard on June 30, 1986. On September 24, 1986, the IGC reversed his adjustment conviction and ordered that it be expunged from the records, that his good conduct time be restored and that his classification status be reviewed. The Commission found that:

Although the Commission respects confidentiality of informants within a prison environment, the institution should show credibility of a "phantom witness". In this case the "phantom witness's" testimony was not properly documented by the Hearing Officer and the testimony should be purged.

There are means to apprise the prosecutor of evidence acceptable for conviction without revealing the source, but in fairness to the defendant this must be done.

There was no documentation on file for review from this adjustment hearing. There was no attempt to determine the reliability of the "phantom witness".

On November 6, 1986, Baker was advised in writing by Warden Lyles that his adjustment conviction had been reversed and expunged, the 15 days lost good time had been restored, his status had been reviewed, and he was restored to his original status and released from administrative segregation.

Baker appealed the decision of the Inmate Grievance Commission to the Circuit Court for Baltimore City. The Circuit Court on June 5, 1989, found that decision was not supported by "substantial evidence in the record" and ordered the warden to calculate the amount of back pay and the amount of time credits for Industrial Credit and special credit that Baker would have earned in the Print Shop from September 1985 when he was improperly confined in segregation until October 3, 1986, and that these back payments be made to Baker. By use of the process provided by the state, Baker was made whole, except for his time in segregation.

On October 29, 1986, Baker brought the present action, pro se, asking that he immediately be released from administrative segregation and seeking damages for violation of his constitutional rights. In his complaint Baker claimed: (1) Lieutenant Thomas unconstitutionally initiated the adjustment action against him; (2) Security Chief Carpenter conducted the investigation and provided information and the recommendation of segregation; (3) Acting Security Chief Thompson disregarded the Inmate Grievance Commission's decision and had plaintiff placed on administrative segregation; (4) Warden Lyles approved Baker's placement on administrative and punitive segregation; (5) defendants knew of the existing policies, procedures and laws; (6) that Thomas and Carpenter charged plaintiff with an infraction not supported by evidence; (7) plaintiff was not allowed to question the inmate informant and there was no evidence of the informant's credibility; (8) Thomas was an active participant in the adjustment hearing; (9) plaintiff was discriminated against by being placed on administrative segregation while other inmates with similar records

were allowed to remain in the general population; and (10) the infraction ticket was unwarranted and in violation of his due process rights. He sought the appointment of counsel.

The case was referred to a United States Magistrate, who recommended summary judgment in favor of the defendants. After Baker filed his objections to the findings and recommendations of the magistrate, the district court found that the administrative segregation determination was based upon a reasonably held belief that Baker constituted a security risk and that his due process rights were not violated. Baker appealed and counsel was appointed to brief and argue his case.

## II

█ On appeal, Baker has directed his argument to the alleged due process violation resulting from the admission of the undocumented hearsay of the anonymous informant at his hearing on September 4, 1985. He did not name Hearing Officer Tilley as a defendant, although Tilley presided at the hearing and admitted the disputed statement. His claims against Security Chief Carpenter, Acting Security Chief Thompson, and Lieutenant Thomas are totally lacking in merit. These defendants did not conduct the original hearing and did not participate in the review as members of the Classification Team. The allegations of the complaint do not set forth valid claims against them. It was not the investigation by these officers that caused Baker's restraint; it was the action of the hearing officer and the Classification Team that resulted in his segregation from the general prison population.

█ This leaves only Warden Lyles as a defendant. Baker claims that the warden personally reviewed and approved the imposition of punitive segregation against

him on constitutionally deficient grounds, and that Lyles personally reviewed and approved the monthly classification reviews that kept him in segregation. The doctrine of respondeat superior generally does not apply to § 1983 suits. *Monnell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978).[2]

The due process requirements for prison disciplinary proceedings were established in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where the court held that inmates have due process rights, but that such rights must be viewed in light of the prison setting and the necessity of the state to maintain an acceptable level of personal safety within these institutions. The Court found that due process required written notice to the inmate of the charges, an opportunity for the inmate to call witnesses and present documentary evidence in his defense, and a written statement by the fact finders of the evidence relied upon and the reasons for the disciplinary action. However, *Wolff* concluded that there was no constitutional right of an accused to confrontation and cross examination, because such rights would present greater hazards to institutional interests and because "adequate bases for decision" could be established through the use of other procedures. *Id.*, 418 U.S. at 568, 94 S.Ct. at 2980. It left the development of such procedures "to the sound discretion of the officials of state prisons." *Id.* The Court noted that its conclusion

is not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable

---

2. Baker argues that if we rule with him on his constitutional claim, he will amend his pleadings to name the members of the Disciplinary Committee, the Classification Team and Hearing Officer Tilley as defendants. In *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977), we stated: " '[l]iability will only lie where it is affirmatively shown that the official charged acted per-

sonally in the deprivation of the plaintiff's rights. The doctrine of respondeat superior has no application under this section.' " (Citation omitted.) Assuming, without deciding, that Baker has stated a claim against Warden Lyles, we will proceed to the issue of the hearsay statement of the anonymous informant.

accommodation between the interests of the inmates and the needs of the institution.

*Id.*, 418 U.S. at 571–72, 94 S.Ct. at 2982 (footnote omitted).

*Wolff* requires a balancing of the prisoner's rights and interests against the state's interest in protecting the safety and security of inmates and correctional personnel and in promoting correctional goals. In *Wolff,* the Court did not decide, nor has it since decided, the question of whether due process requires that an unsworn hearsay statement of an anonymous informant in a prison disciplinary proceeding must have some indication of the reliability of the informant before it may be admitted and considered as evidence against an inmate. However, *Wolff* recognized the problems of a prison informer and the dangers of revealing his identity to the accused. This was one reason the Court did not give prisoners an unqualified right of confrontation or cross examination.

■ Baker's administrative segregation lasted until he was successful in his appeal to the IGC, and the warden reviewed his status and released him to the general prison population at the end of October 1986. During these months of administrative segregation, his status was reviewed every 30 days while he pursued his right of appeal. Administrative segregation requires only limited due process, as explained in *Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983):

We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interest. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," *Wolff v. McDonnell,* [418 U.S. at 566, 94 S.Ct. at 2979], and have concluded that "to hold ... that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause

would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano,* [427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (emphasis in original)]. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interest in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948). Thus, there is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7 [99 S.Ct. 2100, 2104, 60 L.Ed.2d 668] (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," *Wolff v. McDonnell,* [418 U.S. at 557, 94 S.Ct. at 2975], despite the undoubted impact of such credits on the freedom of inmates. Finally, in *Meachum v. Fano,* [427 U.S. at 225, 96 S.Ct. at 2538], the transfer of a prisoner from one institution to another was found unprotected by "the Due Process Clause in and of itself," even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a "grievous loss." *Moody v. Daggett,* 429 U.S. 78, 88 n. 9 [97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236] (1976). As we have held previously, these decisions require that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242 [96 S.Ct. 2543, 2547, 49 L.Ed.2d 466] (1976). *See also Vitek v. Jones,* 445 U.S. 480, 493 [100 S.Ct. 1254, 1264, 63 L.Ed.2d 552] (1980).

It is plain that the transfer of an inmate to less amenable and more restric-

tive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. The phrase "administrative segregation," as used by the state authorities here, appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. [Statute omitted.] Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. This conclusion finds ample support in our decisions regarding parole and good-time credits. Both these subjects involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms than that at issue here, yet in *Greenholtz* and *Wolff* we held that neither situation involved an interest independently protected by the Due Process Clause. These decisions compel an identical result here.

■ Our court has not decided the issue of the use of unsworn statements of anonymous informants. However, in *Hayes v. Thompson*, 726 F.2d 1015 (4th Cir.1984), we directed the district court on remand to consider this question together with four other due process issues. The record does not reflect what happened to this issue on remand. The first case addressing the issue of unsworn statements of anonymous informants was *Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970), where the court approved a number of rules that had been agreed to by the parties in a class action brought on behalf of the inmates of the Adult Correctional Institutions of Rhode Island. However, these rules relate to "substantial evidence," which is a higher standard than the "some evidence" rule established in *Superintendent, Massachusetts Correctional Institution at Walpole v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), which held that to comport with minimum requirements of due process, the findings of a Prison Disciplinary Board revoking a prisoner's good time

must be supported by "some evidence in the record." *Id.*, 472 U.S. at 454, 105 S.Ct. at 2773. The First Circuit approved the Rhode Island rule in *Gomes v. Travisono*, 510 F.2d 537 (1st Cir.1974). Rules for establishing the reliability of confidential informants in prison settings have been adopted in other circuits. *See Hensley v. Wilson*, 850 F.2d 269 (6th Cir.1988); *Freitas v. Auger*, 837 F.2d 806 (8th Cir.1988); *Mendoza v. Miller*, 779 F.2d 1287 (7th Cir. 1985); *Helms v. Hewitt*, 655 F.2d 487 (3d Cir.1981), rev'd on other grounds, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *McCollum v. Miller*, 695 F.2d 1044 (7th Cir.1982); *Kyle v. Hanberry*, 677 F.2d 1386 (11th Cir.1982).

However, these cases must be considered in light of *Hill*, where the Court held that substantial evidence is not required to support the decision of a prison disciplinary board revoking certain good time credits of an inmate. The test under *Hill* is whether the findings of the prison disciplinary board "are supported by *some evidence in the record.*" *Id.*, 472 U.S. at 454–56, 105 S.Ct. at 2773–74.

The requirements of due process are flexible and depend on a balancing of the interests affected by the relevant government action. *E.g., Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). Where a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily. [*Wolff,*] 418 U.S., at 561 [94 S.Ct. at 2977]. This interest, however, must be accommodated in the distinctive setting of a prison, where disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Ibid.* Consequently, in identifying the safeguards required by due process, the Court has recognized the legitimate insti-

tutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation. See, *e.g.*, *Ponte v. Real,* 471 U.S. 491 [105 S.Ct. 2192, 85 L.Ed.2d 553] (1985); *Baxter v. Palmigiano,* 425 U.S. 308, 321–322 [96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810] (1976); *Wolff v. McDonnell,* [418 U.S.] at 562–563 [94 S.Ct. at 2977–78].

Requiring a modicum of evidence to support a decision to revoke good time credits will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens. In a variety of contexts, the Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. See, *e.g.*, *Douglas v. Buder,* 412 U.S. 430, 432 [93 S.Ct. 2199, 2200, 37 L.Ed.2d 52] (1973) (*per curiam*) (revocation of probation); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239 [77 S.Ct. 752, 756, 1 L.Ed.2d 796] (1957) (denial of admission to bar); *United States ex rel. Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 106 [47 S.Ct. 302, 303, 71 L.Ed. 560] (1927) (deportation). Because the written statement mandated by *Wolff* requires a disciplinary board to explain the evidence relied upon, recognizing that due process requires some evidentiary basis for a decision to revoke good time credits will not impose significant new burdens on proceedings within the prison. Nor does it imply that a disciplinary board's factual findings or decisions with respect to appropriate punishment are subject to second-guessing upon review.

We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." *United States ex rel. Vajtauer v. Commissioner of Immigra-*

*tion,* 273 U.S., at 106 [47 S.Ct. at 304]. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

(Citations omitted.)

Appellant Baker was given the process provided by the Division of Correction Regulations. He was served with the Notice of Infraction prior to the initial hearing before the hearing officer. This notice advised him of the charge against him—possession of contraband in the form of a hacksaw blade and a jeweler's string. He was represented at the hearing; he had the opportunity to call witnesses, but he chose not to do so; and he was allowed to testify. He was provided a copy of the hearing officer's decision and recommendation of 210 days in segregation and loss of 15 days good time. The decision found him guilty of possessing the contraband and stated: "I have a letter from Lieutenant Thomas. Stated that an inmate did get the blade from Russell Baker."

The letter from Lieutenant Thomas is quoted earlier in this opinion, but the statement attached to this letter has disappeared. The recommendation of the hearing officer is not final and is reviewed by a Classification Team; the final decision is made by Warden Lyles. At the time the warden made his final decision and adopted the recommendation of the hearing officer, he had the evidence which was available to the hearing officer plus the September 20, 1985, report of Security Chief Lawrence to Classification Supervisor Rogers, which gave additional details of the planned escape through the exhaust fan in the prison chapel. The evidence before the warden at the time of his decision included Baker's prior escape from the Baltimore County Jail; the September 20, 1985, report of Security Chief Carpenter; and the September 3, 1985, report from Lieutenant Thomas to Security Chief Carpenter stating that

the information he had received was from "a very reliable source," and that one hacksaw carbine blade and one jeweler's string had been found. This evidence meets the "some evidence" standard of *Hill*.

This is not a case where the only evidence before the prison tribunal was the hearsay statement of an unidentified informant. The decisions in *Wolff* and *McCollum* unequivocally establish that appellant does not have a due process right to be informed of the identity of the confidential informant. The decision as to whether to reveal this identity is committed to the sound discretion of prison authorities. The record does not reflect whether appellant or his representative at the initial hearing questioned the reliability of the informant or sought to challenge Lieutenant Thomas' written statement that the information was "from a very reliable source." However, the warden, who made the final decision, had the additional evidence that Baker had previously escaped from a prison, that considerable work had been done to accomplish an escape through the exhaust fan in the institution's chapel, and that certain escape tools had been recovered. Therefore, the requirements of *Wolff* and *Hill* were met, and the district court was correct in granting summary judgment.

Appellant pursued his appeal rights provided by Maryland Division of Corrections Procedures, and he succeeded in having the IGC reverse his adjustment conviction, expunge it from the records, restore his lost time, and direct a review of his classification status. In addition to this, his appeal to the Circuit Court for Baltimore City was successful, and he obtained back pay plus Industrial and Special Project Time Credits for the time that he was unable to work in the Print Shop because of his confinement to segregation. In the process, he convinced the Circuit Court of Baltimore City to adopt a substantial evidence rule, which is not required by *Hill* in a constitutional challenge to prison disciplinary procedures. Thus, appellant was restored to his prior status, his record of conviction by the hearing officer was expunged, and he received back pay for the time he missed from work. He spent time in segregation, but *Helms*

states: "[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Helms*, 459 U.S. at 468, 103 S.Ct. at 870.

*Helms* also sets minimum due process standards for administrative confinement: "[P]etitioners were obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wishes to submit, within a reasonable time after confining him to administrative segregation." *Id.*, 459 U.S. at 472, 103 S.Ct. at 872. Later, it concluded:

We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied. This informal procedure permits a reasonably accurate assessment of probable cause to believe that misconduct occurred, and the "value [of additional 'formalities and safeguards'] would be too slight to justify holding, as a matter of constitutional principle[,] that they must be adopted, *Gerstein v. Pugh*, [420 U.S. 103, 122, 95 S.Ct. 854, 867, 43 L.Ed.2d 54] (1975) ]."

*Id.*, 459 U.S. at 476, 103 S.Ct. at 874.

Baker's classification status was reviewed every thirty days and on each occasion the Classification Team found: "Ap-

proved for placement on Administrative Segregation on 12/11/85. The Classification Team recommended that Baker be assigned to that status based on escape history, esp infraction of 8/31/85." There was a "modicum of evidence" to support the belief that Baker was an escape risk.

We are satisfied that there was evidence sufficient under *Hill* to support the actions of the defendants and that the process provided complied with the requirements for administrative segregation established in *Hewitt v. Helms*. There was no dispute as to a material fact and the district court was correct in entering summary judgment for the defendants.

AFFIRMED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. While it is of course well settled that prisoners are entitled to only limited due process when prison authorities undertake to subject them to disciplinary measures, the issue here relates to an aspect of that residual due process—specifically, whether such discipline can be predicated solely on evidence received from an unidentified informant without any effort to establish the reliability of the informant. In my view, even a prisoner's restricted due process rights require some quantum of evidence that the informant is reliable.

The majority recognizes that every other circuit which has entertained this issue has held that the due process required in these cases, though limited, still necessitates that there be some record documentation of the informant's reliability. These cases, while noting the dangers inherent in identifying the informant to the accused, yet hold that due process requires the hearing tribunal to show that it made some attempt at establishing informant reliability. *Hensley v. Wilson*, 850 F.2d 269 (6th Cir.1988); *Frei-*

*tas v. Auger*, 837 F.2d 806 (8th Cir.1988); *Mendoza v. Miller*, 779 F.2d 1287 (7th Cir. 1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986); *McCollum v. Miller*, 695 F.2d 1044 (7th Cir.1983); *Kyle v. Hanberry*, 677 F.2d 1386 (11th Cir.1982); *Helms v. Hewitt*, 655 F.2d 487 (3d Cir. 1981), *rev'd on other grounds*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Gomes v. Travisono*, 510 F.2d 537 (1st Cir. 1974).

The majority discounts these cases and the rationale underlying them because of its perception that the *Hill* rule—requiring only "some evidence in the record" to support the findings of a prison disciplinary tribunal—overrules these holdings *sub silentio*.[1] *Superintendent, Massachusetts Correctional Institution at Walpole v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985). Underlying the majority opinion, therefore, is its implied holding that a statement purported to be relayed from an unidentified informant is "some evidence" under *Hill* even though there was no effort to ascertain the informant's reliability beyond receipt of a bald assertion that the informant is reliable.[2]

My disagreement with the majority is based on my conviction that evidence of the sort introduced against Baker is essentially no evidence at all. Great positive strides have been made in the modern administration of prisons, but the very nature of "hard core" prisons and those imprisoned there assures that a dark side sometimes lingers. Well-known is the harshness of inprison "justice" administered by prisoners against each other, including infamous means for the settling of scores based on jealousies, gang loyalties, and petty grievances. Unfortunately, there also still may be discrete instances wherein guards seek to retaliate against prisoners if they perceive that regular prison procedures will not adequately redress their grievances.

1. The Sixth, Seventh and Eighth Circuit cases were decided after *Hill* and expressly rely on it. See *Hensley*, 850 F.2d at 282; *Mendoza*, 779 F.2d at 1293; *Freitas*, 837 F.2d at 810.

2. The majority, in finding "some evidence," lumps the confidential informant's statement together with other evidence discovered relating to an escape attempt. However, at the first hearing which imposed punitive segregation on Baker, the adjustment committee relied *solely* on the confidential informant's statement. The "facts" established by this first hearing were then used in justifying further disciplinary procedures against Baker.

Here a guard wrote the hearing officer that a confidential informant had advised him that Baker had a hacksaw blade and a jeweler's string and that the informant later produced such items, saying that he had obtained them from Baker. The guard stated that the informant was very reliable, and the adjustment committee apparently accepted that statement without anything more to establish the informant's reliability. That, to me, is worse than no evidence. It is an open invitation for clandestine settlement of personal grievances.

As the court observed in *McCollum*, 695 F.2d at 1049, "Not all prison inmates who inform on other inmates are telling the truth; some are enacting their own schemes of revenge...." Similarly, in *Kyle*, 677 F.2d at 1390, the court noted:

In a prison environment, where authorities must depend heavily upon informers to report violations of regulations, an inmate can seek to harm a disliked fellow inmate by accusing that inmate of wrongdoing. Since the accuser is usually protected by a veil of confidentiality that will not be pierced through confrontation and cross-examination, an accuser may easily concoct the allegations of wrongdoing. Without a bona fide evaluation of the credibility and reliability of the evidence presented, a prison committee's hearing would thus be reduced to a sham which would improperly subject an inmate accused of wrongdoing to an arbitrary determination.

My view is not, of course, that the informant must be identified to the accused prisoner nor that information regarding reliability must be made available to the accused if that information could enable him to identify the informant. Yet we can look to the opinions of our sister circuits which, in holding that some showing of an informant's reliability must be made in these circumstances, have articulated various ways of establishing reliability without endangering either cooperation from or the personal safety of confidential informants. Any of those formulations or some variation on them should suffice.

The following passages address the need to balance the competing interests at stake in a prison disciplinary hearing in which the evidence against the prisoner is a statement by a confidential informant.

*Helms,* 655 F.2d at 502:

The facts of this case portray a state prisoner subjected to disciplinary sanctions entailing a loss of liberty on the strength of, literally, next to no evidence. Kyler's testimony before the committee, as characterized in the affidavits before us, contained absolutely no indicia of reliability imputable to the alleged undisclosed informant....

Under the tensions and strains of prison living fraught with intense personal antagonisms, determination of guilt solely on an investigating officer's secondary report of what an unidentified informant advised him, albeit by affidavit, invites disciplinary sanctions on the basis of trumped up charges. A determination of guilt on such a record, with no primary evidence of guilt in the form of witness statements, oral or written, or any form of corroborative evidence, amounts to a determination on the blind acceptance of the prison officer's statement. Such a practice is unacceptable; it does not fulfill *Wolff's* perception of "mutual accommodation between institutional needs and [objectives]" and constitutional requirements of due process.... We therefore hold that when a prison tribunal's determination is derived from an unidentified informant, the procedures approved in *Gomes v. Travisono* must be followed to provide minimum due process.

"(1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement."

510 F.2d at 540.

*Mendoza,* 779 F.2d at 1293:

The reliability of confidential informants may be established by: (1) the oath of

the investigating officer as to the truth of his report containing confidential information and his appearance before the disciplinary committee, *McCollum,* 695 F.2d at 1049; (2) corroborating testimony, *Jackson* [*v. Carlson*], 707 F.2d [943] at 948 [7th Cir.1983]; (3) a statement on the record by the chairman of the disciplinary committee that, "he had firsthand knowledge of the sources of information and considered them reliable on the basis of 'their past record of reliability,' " *Id.* at 948; or (4) *in camera* review of material documenting the investigator's assessment of the credibility of the confidential informant.

*Freitas,* 837 F.2d at 810:

We agree with Freitas that a determination of the reliability of confidential informants must be made. Due process requires that there be some evidence supporting the disciplinary determination.... A bald assertion by an unidentified person, without more, cannot constitute some evidence of guilt.

The *Freitas* court added in footnote 8:

*Hill* states that the some evidence standard does not require an "independent assessment of the credibility of witnesses." *Id.* [472 U.S.] at 455, 105 S.Ct. at 2774. We believe consideration of the reliability of confidential informants to be a different matter.

The court went on to quote from the same passage of *Helms* that I have quoted above.

*Kyle,* 677 F.2d at 1390–91:

Balancing these considerations, we believe that where a committee imposes a sanction as severe as the one here, and where the committee's determination is based upon hearsay information derived from an unidentified informant, minimum due process mandates that the IDC undertake in good faith to establish the informant's reliability, at least to its own satisfaction. There must be some information on the record from which a tribunal can reasonably conclude that the IDC undertook such an inquiry and, upon such inquiry, concluded that the informant was reliable. The committee should describe the nature of its inquiry to the extent that the committee is satisfied that such disclosure would not identify an informant.

. . . . .

The government argues that it is enough for the IDC to know that the informant has a past record of reliability. That knowledge, however, is not on the record here. Both the investigator's report and the confidential report indicated that their sources were considered reliable, but neither one explained why. Indeed, there is nothing on the record to show that the IDC made any inquiry into reliability or that it was furnished with any information explaining the trustworthiness and credibility of the "reliable sources."

(Footnote omitted.)

Not only do I agree with the reasoning of *Kyle, Freitas, Mendoza,* and *Helms,* but I am convinced that the rationale of these cases and the very basic right they seek to protect are not overshadowed by the *Hill* "some evidence" rule. I think this case should be reversed, *inter alia,* to instruct prison officials in this circuit in this discrete due process area.