**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-6910**

_____

MICHAEL ANTHONY DILWORTH,

               Plaintiff - Appellant,

        v.

CAPTAIN ADAMS; A R. FALES, JR.; LT. L. ROBINSON; LT. R.
JOHNSON; OFFICER COOKSON; OFFICER TROTT,

               Defendants – Appellees,

        and

ED MCMAHON, Sheriff; New Hanover County; LT. TRAVIS ROBINSON;
SGT. WHITMORE; OFFICER MARINO; MR. WHITE; MR. THOMAS,

               Defendants.

_____

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   James C. Dever III,
Chief District Judge.  (5:13-ct-03291-D)

_____

Argued:  September 20, 2016      Decided:  November 7, 2016

_____

Before WILKINSON, MOTZ, and HARRIS, Circuit Judges.

_____

Reversed in part, vacated in part, and remanded by published
opinion.   Judge Harris wrote the opinion, in which Judges
Wilkinson and Motz joined.

_____

**ARGUED:** E. Brantley Webb, MAYER BROWN LLP, Washington, D.C., for
Appellant.   Scott Christopher Hart, SUMRELL, SUGG, CARMICHAEL,
HICKS & HART, P.A., New Bern, North Carolina, for Appellees.  **ON**

**BRIEF:** Jason R. LaFond, MAYER BROWN LLP, Washington, D.C., for Appellant.

———————————

PAMELA HARRIS, Circuit Judge:

In 2013, Michael Anthony Dilworth was a pretrial detainee at North Carolina's New Hanover County Detention Facility. While awaiting trial, Dilworth spent a total of 85 days in disciplinary segregation as punishment for two disciplinary infractions, one arising from an altercation with another prisoner and one from an altercation with correctional officers. Dilworth was not afforded a hearing in connection with either of his placements in disciplinary segregation.

Dilworth sued various Detention Facility officials under 42 U.S.C. § 1983, arguing that the imposition of disciplinary segregation without a hearing violated his procedural due process rights. The district court granted summary judgment to the defendants, reasoning that due process requirements were satisfied by Dilworth's opportunity to file a written appeal after he was placed in disciplinary segregation. We disagree, and hold that as a pretrial detainee, Dilworth was entitled to a hearing before he was punished. As the defendants concede, no such hearing was afforded, and we therefore direct that judgment be entered for Dilworth on his due process claim.

Dilworth also raised an excessive force claim against the two officers involved in his second fracas. Again, the district court granted summary judgment to the defendants, on the ground that the record showed the officers had acted in good faith and

3

without a culpable state of mind. As the parties agree, a subsequent Supreme Court decision has made clear that excessive force claims by pretrial detainees are governed by an objective standard, rather than the subjective one applied by the district court. Accordingly, we remand for consideration of Dilworth's excessive force claim under the proper standard.

**I.**

**A.**

Dilworth was held in the New Hanover County Detention Facility as a pretrial detainee. A pretrial detainee is someone who has been charged with a crime – in Dilworth's case, failing to appear in court as ordered – but not yet tried. Though Dilworth had "not been adjudged guilty of any crime," he could be detained pending trial in order to ensure his presence at that proceeding. See Bell v. Wolfish, 441 U.S. 520, 536 (1979).

During his pretrial detention, at 4:20 p.m. on the afternoon of May 11, 2013, Dilworth was involved in a physical fight with another inmate. Officer Charles Thomas, the supervising guard, immediately placed the unit on "lockdown" while he summoned assistance. Less than an hour later, at 5:05 p.m., Thomas filed an "Inmate Disciplinary Report" describing the incident and stating that he had taken the "disciplinary action" of placing Dilworth in segregation for 45 days. J.A.

4

58. By 5:30, the watch commander on duty, Lieutenant Robert Johnson, had reviewed and approved that penalty.

Dilworth maintained that he had been disciplined in error, as he was not the aggressor in the fight but had only protected himself. On May 21, he filed a written appeal pursuant to the Detention Facility's disciplinary procedures. On May 23, two days later and twelve days after Dilworth's initial placement in segregation, administrative review officer A.R. Fales dismissed the appeal, finding that a videotape of the incident did not make clear "who started the fight or how[.]" J.A. 55. Dilworth ultimately was released from segregation on June 20, 2013. At no point during his time in disciplinary segregation was Dilworth afforded a hearing.

Shortly after his release, Dilworth was involved in a second altercation, this one involving Officers B.M. Cookson and A. Trott. The incident ended with Cookson using physical force to restrain Dilworth, "throw[ing] multiple knee spears to his legs and multiple punches to his head," and with Trott "assist[ing] Cookson in taking Dilworth to the floor." J.A. 126 (internal quotation marks omitted). How the incident began is disputed: According to the officers, force was required because Dilworth refused to comply with orders and resisted an effort to handcuff him; according to Dilworth, Cookson rushed him after the two exchanged verbal insults. This incident, too, was

5

captured on video tape, but although Dilworth requested the video in a "Motion for Production of Documents" filed with the district court, there is no indication that the tape was turned over to Dilworth or viewed by the district court.

Again, Dilworth was placed in disciplinary segregation for 45 days. Again, no hearing was provided. Within five hours of the July 5, 2013 fight, Trott had filed an Inmate Disciplinary Report calling for 45 days in segregation as a disciplinary action, and Lieutenant Johnson had reviewed and approved the sanction. Dilworth once more contested his sanction, and this time, he filed a grievance seeking a hearing at which he suggested he would present witnesses supporting his account of events. And Dilworth again filed a written appeal of the disciplinary action, which was again dismissed by Fales, who emphatically rejected the request for a hearing: "I am **NOT** required to recommend a disciplinary hearing if grounds for such do not exist." J.A. 60 (emphasis in original). Dilworth served the entirety of his 45-day sentence.

**B.**

In November 2013, Dilworth filed this pro se action under 42 U.S.C. § 1983. He alleges, first, that Detention Facility officials including Johnson and Fales violated the Due Process Clause of the Fourteenth Amendment by failing to provide adequate procedural safeguards – and, particularly, a hearing –

6

in connection with his two disciplinary sanctions. Second, Dilworth claims that Cookson and Trott used excessive force against him, also in violation of the Fourteenth Amendment.

The defendants moved for summary judgment on both claims, and the district court granted their motion. As to procedural due process, the district court held that because Dilworth was a pretrial detainee, he could not be "placed in segregation as a punishment for a disciplinary infraction" without due process. J.A. 129 (internal quotation marks omitted). Due process was satisfied here, the district court reasoned, because Dilworth was provided with notice of the charges against him and permitted to file a written appeal of his disciplinary sanction. On that basis, the district court awarded summary judgment to the defendants.

On Dilworth's excessive force claim, the district court applied a subjective standard, holding that Dilworth was required to establish that officers Cookson and Trott had used force "maliciously and sadistically to cause harm," rather than in a "good-faith effort" to maintain discipline. J.A. 130 (internal quotation marks omitted). Because no reasonable juror could find that the officers had a "sufficiently culpable state of mind," the district court concluded, the defendants were entitled to summary judgment. J.A. 131-32 (internal quotation marks omitted).

7

Dilworth timely appealed.

## II.

We review a district court's award of summary judgment de novo.  Jehovah v. Clarke, 798 F.3d 169, 176 (4th Cir. 2015).  Summary judgment is appropriate only if "no material facts are disputed and the moving party is entitled to judgment as a matter of law."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)) (internal quotation marks omitted).

## A.

We begin with Dilworth's contention that the district court erred when it granted summary judgment to the defendants on his procedural due process claim.  The due process question presents two related but distinct inquiries:  whether Dilworth's placement in disciplinary segregation implicated a liberty interest triggering procedural due process requirements; and, if so, whether the procedures afforded Dilworth satisfied those requirements.  See Wolff v. McDonnell, 418 U.S. 539, 556–57 (1974) (applying procedural due process analysis to denial of prisoner good-time credits); Slezak v. Evatt, 21 F.3d 590, 593–94 (4th Cir. 1994) (applying procedural due process analysis to prison classification system).  We hold that the disciplinary

8

actions taken against Dilworth necessitated compliance with procedural due process standards, and further hold that those standards were not satisfied here.

**1.**

At the first step of the procedural due process inquiry, we must determine whether Dilworth's placement in disciplinary segregation implicates a protected liberty interest and thus warrants procedural safeguards. See Sandin v. Conner, 515 U.S. 472, 484–86 (1995). The district court answered that question in the affirmative, holding that pretrial detainees like Dilworth may not be placed in disciplinary segregation without due process. On this point, we agree with the district court.

By definition, pretrial detainees have not been convicted of the crimes with which they are charged. For that reason, the Supreme Court held in Bell v. Wolfish, they retain a liberty interest in freedom from "punishment," even while they are detained to ensure their presence at trial. 441 U.S. at 535-37. Though "[l]oss of freedom of choice and privacy are inherent incidents" of pretrial detention, discrete "punitive measures" imposed during pretrial detention intrude on a protected liberty interest. Id. at 537; Surprenant v. Rivas, 424 F.3d 5, 17 (1st Cir. 2005) ("Pretrial detainees, unlike convicts, have a liberty interest in avoiding punishment[.]"); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) (finding pretrial detainees are

9

protected with respect to "<u>any</u> form of 'punishment'") (emphasis in original).

Though <u>Bell</u> would appear to settle the issue, the defendants take a different position. According to the defendants, the Supreme Court clarified in <u>Sandin v. Conner</u> that only a subcategory of prison "punishments" will infringe on protected liberty interests and necessitate due process protections: those that impose "atypical and significant hardship" on prisoners. <u>See</u> 515 U.S. at 484. Because disciplinary segregation, the Court held in <u>Sandin</u>, does not rise to this level, <u>id.</u> at 485-86, the defendants conclude that Dilworth had no protected liberty interest and thus was not entitled to due process at all.

But <u>Sandin</u>, which concerned the punishment of <u>convicted</u> prisoners, <u>id.</u> at 474-75, 484-85, has no application to pretrial detainees like Dilworth. In <u>Sandin</u>, the Supreme Court explained that prison regulations providing for procedures in connection with punishment will not give rise to a protected liberty interest unless the punishment in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484. That was so, the Court reasoned, because a wide range of "[d]iscipline by prison officials . . . falls within the expected perimeters of the <u>sentence imposed by a court of law</u>." <u>Id.</u> at 485 (emphasis

10

added).  But pretrial detainees, as we have explained, have not been convicted or sentenced by a court of law, and thus fall plainly outside this rationale.  And indeed, the Court in Sandin expressly distinguished Bell on precisely this ground.  Id. at 484 (rejecting prisoner's reliance on Bell because "Bell dealt with the interests of pretrial detainees and not convicted prisoners"); see also Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015) ("pretrial detainees (unlike convicted prisoners) cannot be punished at all").

Every federal court of appeals to consider the question has concluded that Sandin's "atypical and significant hardship" standard does not govern the procedural due process claims of pretrial detainees.  See Jacoby v. Baldwin Cty., No. 14-12932, 2016 WL 4506051, at *6 (11th Cir. Aug. 29, 2016); Hanks v. Prachar, 457 F.3d 774, 776 (8th Cir. 2006) (per curiam); Surprenant, 424 F.3d at 17; Peoples v. CCA Det. Ctrs., 422 F.3d 1090, 1106 n.12 (10th Cir. 2005); Benjamin v. Fraser, 264 F.3d 175, 188-89 (2d Cir. 2001); Rapier v. Harris, 172 F.3d 999, 1004-05 (7th Cir. 1999); Mitchell v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996); see also Fuentes v. Wagner, 206 F.3d 335, 342 n.9 (3rd Cir. 2000) (holding Sandin inapplicable to detainee convicted but not yet sentenced), cert denied, 531 U.S. 821 (2000).  We join our sister circuits and hold that Dilworth, as a pretrial detainee, was entitled under Bell to procedural due

11

process in connection with any "punishment" imposed on him by the Detention Facility.

It remains to be considered only whether Dilworth's two placements in disciplinary segregation constitute "punishment" within the meaning of Bell. That a "disability is imposed for the purpose of punishment," the Court held in Bell, may be clear from "an expressed intent to punish on the part of detention facility officials[.]" 441 U.S. at 538. If it is not, then a court still may infer an intent to punish if a "restriction or condition is not reasonably related" to some other legitimate goal. Id. at 539; see Martin, 849 F.2d at 870 (to establish that restriction is "punishment," pretrial detainee must show "either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate non-punitive governmental objective"); Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 251 (4th Cir. 2005) (same).

In this case, an intent to punish is express, and manifestly clear from the record. Dilworth's placement in segregation was identified as a "disciplinary action[] taken" on the "Inmate Disciplinary Report" filed in connection with each of his altercations. J.A. 64, 69. In dismissing Dilworth's appeals, administrative review officer Fales referred expressly to the "disciplinary sanctions" and "disciplinary actions" on review. J.A. 55, 60. And in their brief on appeal, the

12

defendants similarly, and consistently, describe Dilworth's placement as "disciplinary," a "disciplinary action," and a "penalty for [] disciplinary violations." When it comes to intent, in other words, this is the easy case in which we need not go beyond what is express.

The defendants suggested for the first time at oral argument that the restriction imposed on Dilworth might be so "de minimis" that it cannot amount to punishment under <u>Bell</u>, whatever its intent. See <u>Bell</u>, 441 U.S. at 539 n.21 (defining "punishment" in terms of intent but noting that there is "a <u>de minimis</u> level of imposition with which the Constitution is not concerned") (internal quotation marks omitted); <u>Robles v. Prince George's Cty., Md.</u>, 302 F.3d 262, 269 (4th Cir. 2002) (finding pretrial detainee must show that official action was not "de minimis" to invoke due process protections); <u>Slade</u>, 407 F.3d at 251 (same). Though some cases may present close questions on this score, see <u>Collins v. Ainsworth</u>, 382 F.3d 529, 545 (5th Cir. 2004) (finding denial of phone calls and mattresses for less than 24 hours to be de minimis), this one does not. For the 85 days in which he was in disciplinary segregation, Dilworth was confined to his cell for 23 hours each day and denied all personal contact except with attorneys or clergy. Other courts have had no difficulty classifying this sort of disciplinary segregation as "punishment" under <u>Bell</u>. See <u>Kirk</u>

13

v. Boyles, 2010 WL 2720886, at *2 (E.D. Cal. July 8, 2010) (magistrate report) (rejecting argument that three-day disciplinary confinement is de minimis), adopted by, 2010 WL 3516630 (E.D. Cal. Sept. 8, 2010); see also Surprenant, 424 F.3d at 13–14 (treating disciplinary segregation as punishment); Higgs v. Carver, 286 F.3d 437, 438 (7th Cir. 2002) (same); Mitchell, 75 F.3d at 524 (same). The Detention Facility itself, in its policy on inmate disciplinary procedures, appears to agree, treating disciplinary segregation as a sanction implicating liberty interests and triggering procedural protections. J.A. 105. We, too, conclude that disciplinary segregation of a pretrial detainee, intended as a penalty for disciplinary infractions, implicates a protected liberty interest under the Fourteenth Amendment and may not be imposed without due process.

**2.**

Having determined that Dilworth was entitled to due process before he was punished with disciplinary segregation, we turn to the question of whether the procedures afforded Dilworth satisfied Fourteenth Amendment requirements. We do not doubt, as the Supreme Court has held, that the realities of the prison environment require "some amount of flexibility" in the due process inquiry, so as to accommodate the very real interest of prison officials in maintaining order and safety. Wolff v.

14

McDonnell, 418 U.S. 539, 566 (1974).  But the Supreme Court has set out certain procedural minimums that pertain even in the prison setting, and those requirements were not met here.

The elements of due process in prison disciplinary proceedings were established by the Supreme Court in Wolff.  Emphasizing the need for "mutual accommodation" of institutional objectives and constitutional rights, id. at 556, the Wolff Court struck a careful balance between inmates' due process interests and the legitimate goals and security concerns of a penal institution, id. at 556-63.  The result was a clear explication of the necessary procedural safeguards, beginning, most critically, with a hearing, at which an inmate may call witnesses and present documentary evidence unless doing so would present an undue hazard.  Id. at 557-58 ("The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests . . . . We think a person's liberty is equally protected[.]").  An inmate also is entitled, the Court held, to written notice of the alleged disciplinary violation at least 24 hours before the hearing, and, after the hearing, to a written statement describing the reasons for the disciplinary action taken.  Id. at 563-65.

We note that the requirements laid out in Wolff are clear enough that the Detention Facility has incorporated them into

15

its own published policy on inmate discipline. Under that policy, as per Wolff, an inmate charged with a disciplinary violation implicating a liberty interest is entitled, after 24 hours notice of the charges, to a hearing at which the inmate may make a statement on his or her behalf, present witnesses and evidence, and ask questions of his or her accuser. After the hearing, the inmate is provided a written report describing the disciplinary findings made as a result of the hearing.[1]

As the defendants concede, the process afforded Dilworth complies with neither the Detention Facility's policy nor the dictates of Wolff. There is no factual dispute as to what process Dilworth received: the opportunity to take a written appeal after his sanction was finalized. Nor can there be any question but that this process falls short of what Wolff requires.

Under Wolff, the core component of due process in the prison discipline context is the right to a hearing. To be

---

[1] To be clear, Dilworth's liberty interest, as explained in Bell, arises from the Constitution itself, and not from any mandatory language in the Detention Facility's policy. See 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); cf. Sandin, 515 U.S. at 483-84 (discussing circumstances under which state may create liberty interest through mandatory regulatory language). The Detention Facility's policy does, however, suggest both that Wolff's requirements are generally understood and that the Detention Facility believes itself able to comply with them.

sure, Wolff does not contemplate "full adversary proceedings," Benjamin, 264 F.3d at 190, and prison officials retain the discretion to "keep [a] hearing within reasonable limits" in an effort to avoid disruption and threats to safety. Wolff, 418 U.S. at 566. For instance, prison officials need not permit an inmate to cross-examine witnesses against him, nor allow an inmate to call witnesses who would "create a risk of reprisal or undermine authority"; and inmates do not possess the right to retained or appointed counsel. Id. at 566-70; see also Baker v. Lyles, 904 F.2d 925, 932–33 (4th Cir. 1990) (permitting use of hearsay statements by unidentified informants in prison disciplinary hearings). But the hearing itself, at which a pretrial detainee like Dilworth may contest whether he has in fact violated a disciplinary rule before he is punished, is the minimal requirement of the Wolff process. See 418 U.S. at 557-58; see also, e.g., Mitchell, 75 F.3d at 524 ("[P]retrial detainees may be subjected to disciplinary segregation only with a due process hearing[.]"); Benjamin, 264 F.3d at 190 (contrasting hearing required by Wolff with more minimal process required for prison administrative actions).[2]

---

[2] Indeed, the petitioner in Wolff was afforded a hearing before he was sanctioned; the issue in Wolff was whether that hearing provided sufficient process, or whether more was required. 418 U.S. at 559-60. In holding that an inmate's right to call or cross-examine witnesses must be balanced
(Continued)

17

That minimal requirement was not satisfied here. As the defendants acknowledge, Dilworth never was provided a due process hearing. Instead, when Dilworth requested a hearing, a Detention Facility official informed him that the official was "**NOT** required to recommend a disciplinary hearing if grounds for such do not exist." J.A. 60 (emphasis in original). Nor can Dilworth's opportunity to file a written appeal substitute for the missing hearing. A statement in writing is not a hearing, and it is not what is contemplated by Wolff – as is clear, for instance, when Wolff holds that an inmate has a qualified right to call witnesses to testify at his hearing. 418 U.S. at 566-67. And by definition, an appeal is a request for review of an action already taken, whereas Wolff's due process hearing is to be provided before final deprivation of a liberty interest. Id. at 557-58.

That is not to say, of course, that prison or jail officials are barred from taking immediate action, without a prior hearing, in response to altercations like Dilworth's or other disciplinary offenses. On the contrary, it is clear – and Dilworth does not dispute – that for safety or security reasons,

---

against a prison's need for order and security, in other words, the Court cast no doubt on the necessity of the underlying hearing itself.

18

a jail may take immediate preventative action to segregate a detainee after a fight or disruption. See, e.g., Baker, 904 F.2d at 930-31; Higgs, 286 F.3d at 438. And prisons and jails may and routinely do place inmates charged with disciplinary infractions in "administrative segregation" pending their disciplinary hearings, allowing both prison officials and inmates time to investigate and prepare for those hearings. See Hewitt v. Helms, 459 U.S. 460, 463-65, 473-74 (1983) (approving placement of inmate in administrative segregation pending investigation and hearing on disciplinary charges), receded from on other grounds by Sandin, 515 U.S. at 482–83; see Brown v. Braxton, 373 F.3d 501, 503 (4th Cir. 2004) (inmate placed in "administrative detention" pending disciplinary hearing while officials investigated altercation). The Detention Facility's disciplinary policy contemplates as much, providing that an inmate may be placed in segregation prior to a hearing and formal disciplinary action to ensure order and security, and we have no quarrel with that understanding. But all of this presupposes that there is, in fact, a hearing in connection with the final imposition of disciplinary action, and that is the element that is missing here.

On this record, it is plain that Dilworth was not provided a hearing before he was subjected to punishment in the form of disciplinary segregation, and the defendants do not contend

19

otherwise. That is enough to resolve Dilworth's due process claim as a matter of law. We remand for resolution of Dilworth's damages claim, consistent with this opinion.

**B.**

We next address Dilworth's contention that the district court erred in granting the defendants summary judgment on his excessive force claim. As noted above, the district court applied a subjective standard to Dilworth's claim, requiring Dilworth to show that Officers Cookson and Trott had acted "with a sufficiently culpable state of mind" in the form of an intent to "maliciously and sadistically [] cause harm." J.A. 130 (internal quotation marks omitted). Because the record could not support such a finding, the district court granted summary judgment to the defendants.

After the district court issued its ruling, the Supreme Court held in Kingsley v. Hendrickson that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." 135 S. Ct. at 2473. It is enough, the Supreme Court concluded, that a pretrial detainee show that the "force purposely or knowingly used against him was objectively unreasonable," id., regardless of an officer's state of mind, id. at 2472.

The parties agree that the district court has not evaluated Dilworth's claim under the standard set out by the intervening

20

decision in Kingsley. Accordingly, we remand so that the district court may consider, in the first instance, whether under the "facts and circumstances" of this particular case, and from the "perspective of a reasonable officer on the scene," the force used against Dilworth was objectively excessive. Id. at 2473; see Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 264 (4th Cir. 2001) (remanding for reconsideration in light of intervening authority). In deciding whether summary judgment may be granted to the defendants under that objective standard, the district court should view the video of the July 5 incident and consider it along with other relevant evidence bearing on objective reasonableness. Cf. Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir. 2006) (holding grant of summary judgment on excessive force claim premature where district court has not considered videotape evidence).

## III.

For the foregoing reasons, we reverse the district court's grant of summary judgment to the defendants on Dilworth's due process claim, order that judgment be entered for Dilworth, and remand for resolution of Dilworth's damages claim. We vacate the district court's grant of summary judgment to the defendants

21

on the excessive force claim and remand for further proceedings consistent with this opinion.

<u>REVERSED IN PART, VACATED IN PART, AND REMANDED</u>